UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BELINDA WHEELER, individually and on behalf of all others similarly situated, | Civil Action No. 22-00763 (BAH) |
| *Plaintiff*, | Chief Judge Beryl A. Howell |
| v. | |
| PANINI AMERICA, INC. | |
| *Defendant*. | |

## MEMORANDUM OPINION

Plaintiff Belinda Wheeler is an unhappy customer.  She purchased several trading card boxes from defendant Panini America, Inc., a trading card company, with the hopes of entering the defendant's contest, or "lottery", to potentially win a rare, extremely valuable trading card. Indeed, on the outside of defendant's trading card boxes is a notice that reads "No Purchase Necessary" to participate in the lottery—but to read the instructions about how to enter defendant's contest, she had to purchase and open the trading card box.  Had she been able to read the instructions for defendant's contest on the outside of the product prior to purchasing it, plaintiff claims she would never have bought it in the first place.

Plaintiff now brings this putative class action against defendant, alleging violations of federal, D.C., and various other states' consumer protection laws.  Defendant moved to dismiss for lack of subject matter jurisdiction and failure to state a claim.  For the reasons below, plaintiff's Complaint is dismissed with prejudice for lack of jurisdiction.

## I.      BACKGROUND

Defendant is a trading card company that specializes in sports trading cards.  Compl. ¶ 1, ECF No. 1; Def.'s Mot. to Dismiss ("Def.'s Mot.") at 6, ECF No. 8.  Defendant has exclusive licenses with major athletes and sports leagues in the United States, Compl. ¶ 47, to sell trading

cards to consumers at third-party retail stores, big box stores, department stores, hobbyist or card stores, and defendant's own website. *Id.* ¶ 49.

Trading card companies like defendant use a variety of methods to increase demand in their products, including the use of redemption cards, which is the method at issue in this lawsuit. Compl. ¶ 8. When following this strategy, companies, as a general matter, will include instructions on each pack that allows its holder, through use of a special code and a redemption card in the trading card pack, to potentially win a random specialty card. *See id.* ¶ 9. Trading card companies tout the special nature and rarity of these specialty cards that entrants could win, even noting that the specialty card could be signed by an athlete or entertainer. *Id.* ¶ 11. The product's packaging highlights the ability to win a specialty card, and such cards can range in value from $1.00 to $50,000.00. *Id.* ¶ 12.

Included in the defendant's product arsenal are the redemption card packs described above. *Id.* ¶ 13. Multiple packs are sometimes sold within a single box. For example, one of defendant's products is the "Flux 2020-2021 Inaugural Edition" trading card box, which notes the inclusion of redemption cards through statement such as "3 Cards Per Pack," "6 Packs Per Box," and "2 Blaster Exclusive Mojo Prizms! per box, on average[.]" *Id.* ¶ 18. The boxes look like this:



2

*Id.* The fine print at the bottom on the front of the box states, "NO PURCHASE NECESSARY – See Pack for Details[,]" but the side and other panels of the product do not include those instructions. *Id.* ¶¶ 18-19. Instead, the "No Purchase Necessary" ("NPN") instructions are located on the trading card packs *inside* the box, as shown by this graphic:



*Id.* ¶ 21. The instructions read as follows:

> NO PURCHASE NECESSARY: Open only to U.S./Canadian (except Quebec) residents. For chance to obtain any of the cards listed above, at the same odds, hand print your name and complete address on a 3 x 5 card and mail in a #10 envelope to: Panini America Inc., NPN, 2020-21 Panini Flux Basketball, 5325 FAA Blvd., Suite 100, Irving, TX 75061-3601. Canadian entrants must also correctly answer the following mathematical skill-testing question on the 3 x 5 card: $663 + 422 \div 211 \times 812 - 180 = ?$ Limited to two entries per household. Only one card per envelope, mailed separately, postmarked by 1/5/22 and received by 1/12/22 will be accepted. No metered mail. All non-complying entries will be disqualified. Random drawings on or about 1/26/22. Persons selected will receive card(s) via mail within three weeks from drawing date. List of persons selected available upon written request. This offer only available while supplies last.

*Id.*; *see also* Def.'s Mot. at 8.

Without reading the instructions, consumers could not enter defendant's contest to obtain redemption cards, with the result that they must first purchase the trading card box to enter. *Id.* ¶ 23. Nor could someone who wishes to read the fine print purchase the box, read the instructions, and return the product, because merchants do not allow customers to return opened trading card merchandise. *Id.* ¶ 22.

3

Plaintiff is one of those customers.  She purchased the defendant's trading card boxes on one or more occasions at various retail stores in the Washington Metropolitan Area and elsewhere on the eastern coast of the United States between 2021 and 2022.  *Id.* ¶ 50.  Plaintiff believed that purchasing the trading card box was necessary to gain entry to the defendant's contest and gave the purchaser a greater chance at winning the specialty cards.  *Id.* ¶ 51.  By requiring customers to purchase the trading card boxes prior to reading the NPN instructions, plaintiff alleges that "consumers are misled to purchase items they otherwise would not have to, at higher prices."  *Id.* ¶ 22.  Indeed, had she known that those representations and omissions were false, plaintiff says she would not have purchased defendant's products.  *Id.* ¶ 54.

Plaintiff sued defendant on March 21, 2022, individually and on behalf of all others similarly situated who wanted to enter the defendant's NPN contests without purchasing its trading cards, alleging violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. CODE § 28-3901 *et seq.*, and the consumer protection laws of Texas, Kansas, North Dakota, Arkansas, Iowa, Utah, West Virginia, Virginia, South Carolina, Georgia, Alabama, Kentucky, Idaho, Alaska, Hawaii, New Mexico, Maine, and Montana, Compl. ¶¶ 67-77, breaches of warranty under the Magnuson-Moss Warranty Act ("MMWA"), *see* 15 U.S.C. § 2301 *et seq.,* Compl. ¶¶ 78-93, and unjust enrichment under the MMWA.  *Id.* ¶ 94.  Plaintiff seeks monetary and injunctive relief, expenses, and reasonable attorneys' fees.  *Id.* at 13-14, Prayer for Relief, ¶¶ 2-6.

Defendant moved to dismiss, with prejudice, on June 10, 2022, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See* Def.'s Mot. at 4, 12.  The parties completed their briefing in July 2022, *see* Def.'s Reply Br. Supp. Mot. To Dismiss ("Def.'s Reply"), ECF No. 18, so defendant's motion is now ripe for resolution.

## II.    LEGAL STANDARD

In evaluating a motion to dismiss for lack of subject-matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), federal courts must be mindful that they "are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, "have an affirmative obligation to consider whether the constitutional and statutory authority exist for us to hear each dispute." *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 196 (D.C. Cir. 1992)).

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1; *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (*en banc*) ("Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.").  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 134 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Absent standing by the plaintiff, the court lacks subject-matter jurisdiction to hear the claim, and dismissal is mandatory.  *See* FED. R. CIV. P. 12(h)(3).

When the plaintiff's standing is challenged, the court "must assume that [the plaintiff] states a valid legal claim." *Info. Handling Servs., Inc. v. Def. Auto. Print. Servs.,* 338 F.3d 1024, 1029 (D.C. Cir. 2003).  In such cases, the plaintiff bears the burden of "show[ing] a substantial probability that [he or she has] been injured, that the defendant caused [his or her] injury, and that the court could redress that injury." *Carbon Sequestration Council v. EPA*, 787 F.3d 1129, 1133

5

(D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Sierra Club v. EPA*, 292 F.3d 895,

899 (D.C. Cir. 2002)); *see also Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

"Each element of standing must be supported in the same way as any other matter on which the

plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the

successive stages of the litigation." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alterations

omitted) (quoting *Lujan*, 504 U.S. at 561).  Thus, the court must "accept the well-pleaded factual

allegations as true and draw all reasonable inferences from those allegations in the plaintiff's

favor."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.    DISCUSSION

Defendant raises two grounds for dismissal of this putative class action.  First, defendant

argues that plaintiff's complaint should be dismissed for lack of subject matter jurisdiction because

plaintiff has not alleged any injury-in-fact.  Def.'s Mot. at 5.  Second, defendant contends, in the

alternative, that plaintiffs fail to state a claim because plaintiff's alleged injury—forcing potential

entrants to purchase defendant's trading card boxes in order to enter defendant's NPN contest—is

not a cognizable claim for damages under federal and state law.  *Id.* at 12–16.

For the reasons outlined below, plaintiff lacks Article III standing to raise her claims, so

this Court lacks jurisdiction to address the merits, and any amendment would prove futile.[1]

Accordingly, her claims are dismissed with prejudice.

### A.   Plaintiff Lacks Standing to Bring her Claims.

Defendant raises the argument that plaintiff lacks Article III standing to bring her claims.

*See* Def.'s Mot. at 2–3 (nominally arguing that the plaintiff lacks Article III standing such that the

Court lacks subject matter jurisdiction); *cf. id.* at 4–18 (focusing the argument on plaintiff's failure

---

[1]     The D.C. Circuit has held that a district court *cannot* address the merits upon determining that subject matter jurisdiction is lacking.  *Hancock v. Urb. Outfitters, Inc.,* 830 F.3d 511, 513 (D.C. Cir. 2016) ("The district court erred at the outset when it bypassed the jurisdictional question of [plaintiff's] standing and dove into the merits of this case. In doing so, the district court stepped where the Constitution forbade it to tread.").  Since plaintiff cannot satisfy Article III standing, whether plaintiff fails to state a claim is an issue that need—and should—not be reached.

to state a claim upon which relief can be granted, rather than that plaintiff has not suffered an injury-in-fact within the meaning of Article III).  Plaintiff points out in her opposition the relative dearth of briefing by defendant on the critical subject matter problem raised.  *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 16, ECF No. 16 (quoting Def.'s Mot. at 1, 11) ("Under the guise of Rule 12(b)(1), Defendant asserts that Plaintiff's 'disappointment' she was forced to participate in its 'illegal lottery' is not sufficient to 'allege[]d an injury in fact.'").

Defendant's briefing focus is irrelevant, however: "When there is doubt about a party's constitutional standing, the court *must* resolve the doubt, *sua sponte* if need be."  *Bauer v. Marmara*, 774 F.3d 1026, 1029 (D.C. Cir. 2014) (cleaned up) (emphasis in original); *accord DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quotation marks and citation omitted) (dismissing suit for lack of standing even though issue was not addressed by court below and noting that courts "have an obligation to assure [themselves] of litigants' standing under Article III").  Indeed, "[f]ederal courts cannot address the merits of a case until jurisdiction—the power to decide—is established."  *Hancock*, 830 F.3d at 513.

To establish Article III standing, plaintiff must allege sufficient facts to show the following: (1) an "injury in fact" that is "concrete and particularized," *Lujan*, 505 U.S. at 560; (2) an injury that is "actual or imminent, not conjectural or hypothetical[,]" *id.*; and "a causal connection between the injury and the conduct complained of," and "a likelihood that a court ruling in [plaintiffs'] favor would remedy their injury[,]" *id.*  Defendant says that plaintiff cannot satisfy Article III's "injury in fact" requirement.  *See* Def.'s Mot. at 6.  Defendant is right.

To begin, plaintiff's causes of action alleging defendant's violations of various state and federal consumer protection laws all stem from the same factual allegation—namely, that defendant prints the NPN notice outside the box, with the participation instructions inside the individual packs of cards, rather than on the outside of the box—meaning that "potential entrants to the contest are required to purchase the Product" to enter the contest.  Compl. ¶ 21.  Plaintiff

7

thus suggests that she only purchased the trading card boxes to enter defendant's NPN drawing, not to purchase the cards themselves, *see id.* ¶ 51, 54, despite the fact that she made such purchase more than once over a fairly lengthy period of time and presumably would have been aware of the need to read the NPN instructions inside the box after the first purchase.  Defendant's conduct purportedly violated sections of the CPPA, the MMWA, and constitutes unjust enrichment.

First, subsections (a), (b), (d), and (e–1) of the CPPA proscribe persons from representing that the goods, services, or persons, have certain qualities that they do not possess.  D.C. CODE § 28–3904(a), (b), (d), (e–1).  Subsection (s) forbids "pass[ing] off goods or services as those of another."  *Id.* § 28–3904(s).  And subsections (e), (f), and (f–1) prohibit making representations or omissions "as to a material fact" when those representations or omissions have "a tendency to mislead."  *Id.* § 28–3904(e), (f), (f–1).  Under the CPPA, "a statement or 'omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action.'"  *Mann v. Bahi*, 251 F. Supp. 3d 112, 126 (D.D.C. 2017) (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013)).  Under plaintiff's theory, defendant violated the CPPA because the NPN notice on the outside of the trading card box made her mistakenly believe did not have to purchase anything to enter the defendant's NPN lottery.  *See* Pl.'s Opp'n at 8.

Plaintiff's warranty claims under the MMWA claims rest on a similar theory of material misrepresentation.  "The Magnuson-Moss Act was promulgated to increase consumer rights and protections by imposing minimum standards for manufacturers' warranties and by providing various avenues for consumer redress."  *Abedrabbo v. Topps Meat Co., LLC*, 756 F. Supp. 2d 18, 21 (D.D.C. 2010) (quotation marks omitted).  The Act confers upon consumers a private cause of action for (a) violations of the substantive provisions of the Act, and (b) breaches of a written or implied warranty.  15 U.S.C. § 2310(d)(1).  Although plaintiff's opposition is difficult to decrypt, she seems to allege defendant violated the MMWA by selling a "defect[ive]" product because it

falsely included a NPN notice on the outside of the box when, to enter the contest, plaintiff was in fact required to purchase the defendant's product to see the full NPN instructions.  *See* Compl. ¶ 26.

Finally, plaintiff's unjust enrichment claim is based on the same underlying theory of harm. Under D.C. law, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).  Plaintiff reasons that she was forced to buy defendant's product to enter the NPN contest despite the NPN notice on the outside of the product, that plaintiff only sought to enter the contest, and that defendant retained the benefit (the value of the product), thereby unjustly enriching defendant.  *See, e.g.*, *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46–47 (D.C. Cir. 2014) ("[D]efendants [allegedly] included misleading language on the dues statement in order to deceive plaintiffs into overpaying for APA membership.  Plaintiffs seek recovery of the alleged overpayments.").

None of these theories for relief are premised on a concrete injury.  First, plaintiff says that she suffered a "cognizable overpayment injury" because defendant omitted putting the NPN instructions on the outside of the box, fraudulently inducing her to buy its product to participate in the NPN lottery, *see* Pl.'s Opp'n at 4, but her naked allegation is unpersuasive.  As multiple federal courts have held, plaintiff paid the purchase price for the value of the box of cards—not for the ability to enter the NPN lottery—so she got exactly what she paid for.  *See Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d 1083, 1087 (9th Cir. 2002) ("At the time the plaintiffs purchased the package of cards, which is the time the value of the package should be determined, they received value— eight or ten cards, one of which might be an insert card—for what they paid as a purchase price."); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) ("[P]laintiffs received a pack of trading cards for their money; they got exactly what they paid for and they do not and cannot allege

otherwise.") (quotation marks and alterations omitted); *Austin-Spearman v. AARP Servs. Inc.*, 119 F. Supp. 3d 1, 14 (D.D.C. 2015) (J. Jackson, K.B.) ("[C]onclusory statements regarding a plaintiff's own beliefs and expectations are not sufficient to support an alleged 'overpayment' injury; rather, a plaintiff must allege facts that demonstrate that the breached term was objectively essential to the contract at issue, such that the violation effectively robbed the plaintiff of her payment because what she received was not what the parties agreed she had purchased."). Apart from her wholly unsupported statement that the NPN lottery was the reason she purchased defendant's trading card box—apparently on more than one occasion—plaintiff does not even attempt to distinguish these cases and alleges no other facts to support her overpayment theory, so that argument fails.

That leads to plaintiff's second theory of harm: that she suffered the procedural violation of not being able to see the NPN instructions on the box before she purchased it. *See* Pl's Opp'n at 4 (arguing that plaintiff, at least, suffered the deprivation of the statutory right to be free from improper trading practices). Even assuming that defendant's failure to put the NPN instructions on the outside of the box, as opposed to on the individual packs of cards, amounts to statutory violations of D.C. and federal law, that injury is too abstract to satisfy Article III standing's injury-in-fact requirement.

Two binding decisions support this result. For starters, in *TransUnion LLC v. Ramirez*, the Supreme Court recently held that, even if Congress enacted a statutory prohibition on certain conduct, that injury does not automatically satisfy Article III's standing requirement because "an injury in law is not an injury in fact." 141 S. Ct. 2190, 2205 (2021). "An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but is merely seeking to ensure a defendant's compliance with regulatory law." *Id.* at 2206 (quotation marks omitted). To determine whether a statutory infraction amounts to a concrete injury under Article III, the *TransUnion* Court explained that the harm must bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 2204.

With these principles in mind, the Supreme Court evaluated the claims of three sets of plaintiffs in a class action brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. The first set of plaintiffs alleged that the defendant failed to "follow reasonable procedures to assure maximum possible accuracy of the plaintiffs' credit files maintained by" the defendant in their credit reports, in violation of 15 U.S.C. § 1681e(b), and the publication of those reports bore misleading alerts that plaintiffs were potential terrorists. *Id.* at 2204 (quotation marks omitted). These class members suffered a "reputational harm associated with the tort of defamation[,]" that the Court determined amounted to a concrete injury in fact under Article III. *Id.* at 2208–09. The second set of plaintiffs alleged the same claim, but their credit reports were not disseminated to third parties; the defendant simply internally maintained inaccurate records in those plaintiffs' internal credit files. *Id.* at 2210. ("In cases such as these where allegedly inaccurate or misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer."). The Court concluded that these plaintiffs lacked the concrete harm of having their inaccurate information published to third parties and thus could not satisfy Article III's injury-in-fact requirement. *Id.* at 2211.

The third set of plaintiffs, who claimed that the defendant violated 15 U.S.C. §§ 1681g(a)(1), 1681g(c)(2) by sending them inaccurate and incomplete credit files upon request, also could not demonstrate that the defendant's statutory violations of the FCRA "caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2213. The plaintiffs presented no evidence that class members "opened the mailings or that "they were confused distressed, or relied on the information in any way." *Id.* (quotation marks omitted). Without any evidence of harm from the inaccurate mailings, the plaintiffs flunked the injury-in-fact requirement because they had only demonstrated "bare procedural violations, divorced from any concrete harm." *Id.* Similarly, here, plaintiff got what

she paid for: a box of cards, so any disappointment in the NPN notice on the outside of the box is simply that—a disappointment which falls short of an injury-in-fact.

      *Hancock v. Urban Outfitters, Inc.* is also instructive.  In that case, the plaintiffs brought a class action alleging violations of the District of Columbia's Use of Consumer Identification Information Act, D.C. CODE § 47–3151 *et seq.*, which provides in relevant part that "no person shall, as a condition of accepting a credit card as payment for a sale of goods or services, request or record the address or telephone number of a credit card holder on the credit card transaction form." *Id.* § 47-3153.  Specifically, plaintiffs claimed that when they made a credit card purchase at the defendant's store, the cashier asked for their zip codes and entered it into the store's point of sale register, rather than into the credit card machine.  *Hancock*, 830 F.3d at 512.  The D.C. Circuit held that the complaint could not "get out of the starting gate" because plaintiffs failed to allege they "suffered any cognizable injury as a result of the zip code disclosures." *Id.* at 514. Indeed, the plaintiffs' "naked assertion that a zip code was requested and recorded without any concrete consequence" was divorced from any real harm, such as an "invasion of privacy, increased risk of fraud or identity theft, or pecuniary or emotional injury." *Id.*  In short, the plaintiffs could not satisfy Article III's injury-in-fact requirement.

      Plaintiff's "injury" here is no different from the second and third set of plaintiffs in *TransUnion* and those in *Hancock*.  Just as the mere maintenance of inaccurate and incomplete credit files and sending of those files to plaintiffs in *TransUnion* could not manifest an Article III injury-in-fact, so too can defendant's failure to include the NPN instructions on the outside of the trading card box not have caused plaintiff "a harm traditionally recognized as providing a basis for a lawsuit in American courts."  141 S. Ct. at 2213.  Nor is plaintiff's injury of not receiving the NPN instructions prior to purchasing defendant's trading boxes any different from the *Hancock* defendant's conduct in verbally requesting customers' zip codes: In both cases, the plaintiffs suffered bare informational and procedural violations of D.C. law devoid of any concrete harm.

Plaintiff's last-ditch effort to support her claim for subject matter jurisdiction is limited to her claim for injunctive relief. She says that because she seeks injunctive relief, and she alleges that she plans on purchasing defendant's trading card boxes in the future "with the assurance [that] the [defendant's] representations [on its trading card boxes] about the [NPN] contests are fair and lawful[,]" she has alleged an injury-in-fact. Pl.'s Opp'n at 11.

Plaintiff's argument goes nowhere—for several reasons. Even if plaintiff is right, her argument would only support her claim to standing for her claims for injunctive relief, not her claims for damages, because she must prove standing for each claim of relief. *See TransUnion*, 141 S. Ct. at 2208 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."). Injunctive relief also would not support subject matter jurisdiction for plaintiff's state law claims under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because plaintiff has not demonstrated that the aggregate amount in controversy would exceed $5 million for pure claims of injunctive relief. *See Sloan v. Soul Circus, Inc.*, No. CV 15-01389 (RC), 2015 WL 9272838, at *10–11 (D.D.C. Dec. 18, 2015) (concluding that the court lacked subject matter jurisdiction over a state law injunction claim predicated on injunctive relief because even if injunctive costs could be included, plaintiff failed to specify how those costs alone would satisfy the amount-in-controversy requirement).

As for plaintiff's MMWA claim, which arises under federal law, *see* 28 U.S.C. § 1331, plaintiff does not have standing to bring her claim for injunctive relief because her injury-in-fact is entirely manufactured. Nowhere does she state or explain how she will suffer a future injury by defendant's failure to put NPN instructions on the outside of the trading card boxes. *See Clapper v. Amnesty Int's. USA,* 568 U.S. 398, 401–02 (2013) ("[Plaintiffs'] theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"). Nor could she: Such an injury, which is premised on a breach of warranty, can

13

only occur *after* plaintiff purchases the product, not if she intends to in the future.  The MMWA statute itself supports this conclusion because it authorizes private plaintiffs the right to bring a private right of action *only for damages*; injunctive relief is left to governmental actors.  *See* 15 U.S.C.A. §§ 2310(c), (d) (allowing private plaintiffs the ability to bring a "[c]ivil action . . . for damages," while authorizing the federal government to bring "[i]njunction proceedings . . . for deceptive warranty, noncompliance with requirements, or violating prohibitions").  At bottom, plaintiff cannot clear the Article III "Cases"-and-"Controversies" hurdle.

### B.  Plaintiff's Complaint Must Be Dismissed with Prejudice.

Plaintiff lacks Article III standing to bring any of her claims, so her complaint must be dismissed for lack of subject matter jurisdiction.  The only question that remains is if the complaint should be dismissed with or without leave to amend.

Dismissal with prejudice is warranted here.  Although "a court should freely give [a party] leave" to amend its pleadings "when justice so requires," a court should deny leave to amend when the amendment, if granted, would be futile.  FED. R. CIV. P. 15(a); *see also Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) ("A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss.").  In no world can plaintiff satisfy Article III standing for her claims for damages because, as described above, her purported injury is too abstract under binding caselaw.  Furthermore, plaintiff would not be able to adduce facts to satisfy subject matter jurisdiction for her claims premised on injunctive relief for the reasons already explained above.  Plaintiff offers no explanation as to why amendment would be beneficial here, *see* Pl.'s Opp'n at 12, and, accordingly, the complaint must be dismissed without leave to amend.

14

## IV.   CONCLUSION

For the above reasons, plaintiff's Amended Complaint is dismissed with prejudice.

Date: November 17, 2022

_____
BERYL A. HOWELL
Chief Judge